May it please the Court, my name is Paula Harms and I represent the petitioner in this matter, Charles Michael Hedlund. I'd like to reserve five minutes for rebuttal and I would like to try to cover three issues today if I could. The ineffective assistance of plea counsel claim, the restraint issue Ineffective assistance of plea counsel Yes, it's claim four in the brief, Your Honor. The restraint issue and the Lockett-Eddings-Penry issue. I didn't get the last one, I'm sorry. The Lockett-Eddings-Penry-Tenard issue. Okay. That's claim seven. The Supreme Court has said that in today's criminal justice system, it's the negotiation of a plea rather than the unfolding of a trial that is almost always the critical point for the defendant and where he most needs the assistance and advice of counsel. In this case, Hedlund was not once but twice offered a plea to a sentence less than death. In a capital case, if you have a willing defendant, a reasonable prosecutor and a judge who has indicated to you that he will accept something less than a death sentence, as defense counsel, you have every obligation to make sure that that plea happens. Instead of pursuing this path and avoiding the death penalty altogether, counsel let Hedlund's chance at a plea slip away. Well, just a minute. As I read the record, the petitioner was adamant he wouldn't plead before Judge Sheldon. How do you get around that? I think we have to assume that he was simply following counsel's advice. There's no reason to assume Hedlund was driving that decision. In fact, it would have been unethical for the defense attorney to file a motion for recusal based upon merely Hedlund's feelings. That's the kind of decision, the kind of decision that is traditionally left to defense counsel, not to the client. Let me put the question a slightly different way. Is there any evidence in the record that Hedlund himself said that he did not want to plead in front of Judge Sheldon? No. All the pleadings say Hedlund. We don't know if it's Hedlund personally, but I think the assumption is he was following defense counsel's advice. And that's why the advice was ineffective, because he should have pled. Exactly. And the case law says that it's counsel's advice to his client that we also must look to. His advice to reject the plea, his advice to seek recusal instead of seeking that plea bargain. Okay. So the counsel did seek recusal instead of putting the second plea agreement in front of Judge Sheldon. Correct. Why was that not a tactical decision? If it was a tactical decision, it wasn't a reasonable decision, and there are two reasons for that. By the time he filed that motion for recusal, the prosecutor's deadline for that plea had already passed. So even if he had succeeded in getting a new judge, he could not have forced the prosecutor to reoffer the plea. Arizona Rule 17.4 says it's completely within the prosecutor's discretion whether or not to offer the plea. The prosecutor said, this is your deadline. Where in the record does the prosecutor's deadline appear? What he said was the actual deadline he set was the Friday. But what happened was counsel rejected it on the Tuesday. The question was, where in the record? Where in the record, right. Right. The reason I'm asking this is because, you know, we get these bench memos, and sometimes the facts that are in the bench memos aren't necessarily exactly what was in the record. So I kind of like to know the record sites from the counsel. Right. Okay. Here's what this is. Respondents supplemental excerpts at A57. We were talking Tuesday afternoon. This is the prosecutor testifying. We were talking Tuesday afternoon, and he advised me that Mr. Hedlund turned down the latest offer, which is in his pleading today. And then in the brief I have the ER site, and I can't put my finger on it right now. So let me try to find it. Okay. Well, you can give me a piece of paper with the site after your argument. I don't want you to waste your time on that. Okay. I would ask one other question in relation to this and trying to determine it. As I reviewed the evidence, it wasn't clear the trial court would accept any plea of second-degree murder for Mertens, and let alone a plea for burglary for McLean. How could there be prejudice in that event? No, actually what the testimony was, and this is the testimony of the prosecutor and the judge, and this is supplemental excerpts of the record, A32 and ER 1360, was that the judge had indicated, well, actually, I think defense counsel first suggested it. He's like, you're rejecting this plea, and he would perhaps burglary in the first degree show more accountability. And both the prosecutor and the judge at that recusal hearing did finally admit that the judge had indicated perhaps that would show more accountability. So it wasn't clear that the judge would have rejected this modification. It was never actually presented to him in order for him to reject it on the record. The only one he rejected did not have the burglary in the first degree. What about the plea of second-degree murder for Mertens? I think the judge had the problem with the McLean homicide. That's what he kept harping on. Was he wanting more accountability for that? Yeah. He wanted he rejected the first one because he wanted more accountability for the McLean homicide. So in the second plea agreement, was there more accountability for the McLean homicide? Yes, there was. And that was what the parties had discussed was adding the first-degree burglary charge. And that's what the parties had come to. And then counsel rejected it. Well, he said, we want to accept it, but we want to enter it before a new judge. But first-degree burglary is simply residential burglary, isn't it? I'm sorry? It's residential burglary, first degree. There was discussions about the judge. But it doesn't have to do with killing, does it? No. All right. Then the question was, was there any more accountability for McLean's killing in the second plea agreement offer? Well, the more accountability was the level, the accountability that the judge had indicated in that off-the-record discussion that he wanted was first-degree burglary. He didn't say he has to plead to murder. He said he indicated, well, perhaps first-degree burglary. Because originally the first plea, it was just a theft charge for McLean. So it exposed him to the difference between the first and the second plea exposed him to approximately about 14 years more than he was exposed to. There was no agreement as to sentence. But if you look at the max, I think what I figured out is it's 34 years versus 20 years. Okay. So this agreement, the second agreement, was never submitted to Judge Sheldon or was it submitted and rejected as untimely? What happened was, is that the judge said the parties, they called him up because they were having a disagreement about what the judge had indicated might be acceptable in a modification. And the judge thought that they were going to come in on Thursday with the paperwork for this modified plea. What happened is that counsel saw the prosecutor in the hallway on Tuesday and said, we want to do this, but we want to do it before a different judge. He waits until Thursday or Thursday afternoon and calls the judge's assistant and says, I want to ask the judge to recuse himself to enter this plea before a different judge. And the judge's judicial assistant says, the judge said you were supposed to come in earlier today to talk about this and you didn't. We're going to trial. So, no, he never reviewed the substance of the modification. So part of your claim seemed to be that counsel was ineffective because he did not keep a record of that plea. How do we know what was in that plea agreement? The first or the second? The second one. Well, yeah, I've been looking at that issue very closely because what the Arizona Supreme Court said was there was no record that an agreement was actually reached and that's because counsel rejected it because they wanted to file the recusal motion instead. But this actual substance of the second plea was really never in dispute because the prosecutor basically, okay, yes, this is ER. I'm sorry. I'm trying to find it exactly here. Okay. This is trial counsel recounted the modified plea in a motion, and the prosecutor admitted that that was a correct statement of the modification. And this is ER 1380 through 81, 1392, and supplemental excerpts of the record for Respondents at A57. Would you repeat those citations? Sure. You're speaking down into the home, into the lectern. I'm trying to write fast. 1380 to 81, 1392, and Respondents' supplemental excerpts at A57. So it was Judge Portley, who was a different judge here in the recusal motion, he specifically asked, okay, what is this second plea we're talking about? Defense counsel says it. And then at some point in the argument, the prosecutor says, you know, that's the one he rejected on Tuesday. So, counselor, in my determination, what is my standard here that I'm looking at? It's simply the Strickland standard. I understand it's the Strickland. But as to this IAC during plea negotiations, am I not really looking at whether the state court's factual finding was unreasonable? Right. And so based on what you've told me thus far, I'm defined that the state court's finding was unreasonable? Yes. And I'll tell you two main reasons why. This is ER 107. The post-conviction court said it was not an ineffective assistance because he only addressed the court's rejection of the plea offer presented to it. In other words, the post-conviction court did not address the modification at all, and the modification added accountability, which is what he said he wanted in order to get a plea. So he didn't really address the modification and counsel's failure to present that and preserve that. It was also unreasonable because he refused to grant a hearing on this claim. And I think it's important for this court to look at Arizona law on that issue, and that's State v. Donald. And it basically says that a defendant need not prevent detailed evidence, and if a doubt exists, a hearing should be allowed so the defendant can raise relevant issues and make a record for review. They say, you know, courts must appreciate in cases such as this where the question turns on the motivation of the defendant, the amount of objective evidence will understandably be spare. However, they say a defendant can inferentially show prejudice by establishing a serious negative consequence, such as receipt of a substantially harsher sentence at trial. Well, here, because of the recusal motion and all the motions filed, we have plenty of objective evidence that Hedlund was willing to take a plea because the prosecution and defense actually reached a first plea, and the prosecutor offered a second, and Hedlund was willing to accept it. That's at ER 1391 through 92, where counsel says, you know, my client wants to take this modification. And we also have the most negative consequences that can possibly occur from the lack of a plea, and that's a death sentence. I want to go back again to the recusal motion. But the Arizona Supreme Court, so are you saying it made an unreasonable determination of the facts regarding the circumstances of the second plea agreement? No, because what they were saying, I think, was there's no record that an agreement was ever reached, and that's because defense counsel rejected it, because he wanted to file this recusal motion instead. I think the confusion comes in, there was really no dispute that what the substance of the second plea was, it was his failure to preserve it, because as an appellate court, judging what the judge did, they couldn't really find fault with it, because there was no record to say that he refused to. So, but what did the Arizona Supreme Court say about this claim? Like, why was counsel not? Well, they, I'm sorry, they didn't say anything about this claim, because they just summarily denied review on post-conviction. So the only reasoning that we have is the lower courts. We have the lower state courts finding, correct? Right, yes. So we're really looking at that court and whether their factual finding was reasonable, correct? Correct. And in making that determination, you have to determine whether it was reasonable not to grant a hearing. And I think in this case, because of the Arizona Supreme Court opinion directly laying the blame at the feet of defense counsel for failing to make a proper record of these first and second pleas, that established part of the colorable claim. And here, unlike other plea cases, we don't have to guess whether or not Hedlund was protesting innocence and was a recalcitrant, difficult defendant. We know that he wanted to take a plea. His counsel was negotiating not one but two pleas, and he was willing to take them. On the recusal issue, there was really no downside to not first presenting the plea and having the judge reject it, because if anything, that would create more of a record for a motion for recusal. And like I said, no new judge could force the prosecutor to reoffer that plea. So it really was not a reasonable strategic decision. What I think happened is counsel simply ran out of time, and it was more a matter of desperation than a truly reasonable strategy. One last question on this. Under Arizona law, at the time, with that plea, was there a possibility he could get capital punishment for the plea of second-degree murder for a murders? Could he get a death sentence for second-degree murder? No. Okay. So this was absolutely a guarantee of life. Yes. Less than life, actually, a term of years. So the consequences were quite stark for Mr. Hedlund. If there are no further questions, I'd like to move to the restraint issue. Respondents have attempted to create a dispute on appeal about visibility. Well, that issue has never really been disputed before. On direct appeal, the Arizona Supreme Court presumed the restraints were visible, as did the district court. At the trial level, the state admitted that the three jurors made post-trial remarks about seeing the defendant wearing the leg brace. The defense investigator testified that after the trial, there was a discussion between he, the prosecutor, defense counsel, a detective, and three jurors. And in this conversation, at least one of the jurors expressed a sense of security in the fact that the defendants were restrained during trial. At ER 763-64, the prosecutor, during his questioning of the defense investigator, basically admitted that these jurors saw the restraints and that he simply questioned them about the effect it had on them. Finally, at petitioner's supplemental excerpts at 2, 5, and 6, there was a law enforcement officer who testified that the photos from the jury box did show a visible leg brace and that they were a fairly accurate representation of what was exposed during the trial. Actually, there are photos in the record that show the shackles. Yes. And there's actual photos. Correct. And, yeah, they're in the ERs also. So if we go past that particular argument, the trial court found that the leg brace was justified based on the joint 1992 Hedlund-McKinney escape plan. Why wasn't preventing this escape an essential State interest sufficient to justify the restraint? Well, I think it's instructive to look at the case law from this circuit on that issue, as well as the Supreme Court's admonition that it should be a matter of last resort. It really has to be a compelling State interest. And Is preventing an escape by two accused murderers a compelling State interest? Well, I think it's questionable whether or not Hedlund was actually involved in this. Could you answer my question? Preventing the escape. I think that the danger of escape has to be revealed. Could you answer my question? Okay. If there was a true danger of escape in this case, yes. All right. I don't think there was a true danger of escape here, and I don't think that's true. So the fact that you say there's not a true danger, what clear and convincing evidence do we have to overcome the trial court's finding? I'm talking about clear and convincing evidence, not argument. Okay. What evidence in the record? Got it. So the judge said after the testimony was, he couldn't link it to Hedlund. Maybe you could answer my question again. What clear and convincing evidence do you have in the record that the trial court's finding was wrong? If you look at ER 1202, six days after the judge asserted that it was only, that he thought that ex parte Hedlund and McKinney were involved, defense counsel called a law enforcement officer to the stand. He said that he clarified that Hedlund's ID badge did have a security warning on it, but it was only because his brother, McKinney, had been alleged to have been involved in the discussions about jumping a guard. They didn't know the name of the other murder defendant. The badge actually read, quote, McKinney planning escape by jumping guard per information. And even if you accept that he was somehow involved seven months prior to trial to talking about escape, the case law says that's not enough. It has to be a real risk of escape. And I would point the court towards Cox v. Ayers. There, it was undisputed that the restraints were unjustified, where defense counsel reported to the court. This is defense counsel telling the judge there was a possibility of an escape attempt. A bailiff also reported a rumor that the defendant attempted to escape.  It was undisputed in that case that that was not a compelling need to restrain the defendants. And the reason it has to be so compelling is because it's an inherently prejudicial practice. You're talking you're addressing the insufficiency of the prosecution evidence regarding the escape. I thought that Judge Smith asked you, inconsistent with 2254e1, where is the clear and convincing evidence which rebuts the trial court's finding? I would simply point back to the law enforcement officer. You're talking about cases saying the evidence isn't sufficient. Is there any evidence which says Hedlund never discussed this with McKinney? Did McKinney ever testify? I never said this. Did anybody say that the person who reported the jailhouse informant was unreliable? Where's the evidence to overcome the finding of the trial judge? What happened was the actual testimony was that it was McKinney and another defendant charged with murder. Another murder defendant. Right. That's all that was ever testified to. And when the judge asserted somehow ex parte, he learned that both were anticipated to be involved, defense counsel called the law enforcement officer to the stand to clarify. This is Lane, right? This is Lane. Yes. Lane was asked questions which in the questions said Hedlund and McKinney, right? And he answered them. I think a lot of the questions were phrased they, Hedlund or McKinney. No, no, Hedlund and McKinney. Okay. And there was no objection that the questions compound. No motion to strike. And that evidence came in. But he did clarify it later by calling him to the stand to get him to read that security badge into the record. And the security badge on Hedlund said McKinney. Well, the reason I asked the question, Judge Bea emphasized it, and I was just trying to say, here we have a district court finding that they needed this. We have a district court finding that based on what he had in front of him, even if I wouldn't have agreed with him, what he had in front of him was enough to do this. And so in those circumstances, then I have to have, and that's why I said the question the way I did, clear and convincing evidence. The best I found in your brief is an argument about what the judge looked at and whether you'd have come out the same way the judge would. Now, I can make those arguments. But what I was looking at, and I searched the record to try to find it, clear and convincing evidence to the contrary. Just arguing about what the judge found when the judge is there with the trial court and trying to have a hearing is not clear and convincing evidence. It's just an argument about what the evidence was in front of him. Well, what I think we also need to consider is that we have to look at the last reason state court opinion for equity purposes. Well, I looked at it. You bet I did. And that's the Arizona Supreme Court. And they admittedly got the facts wrong. They justified it based upon the security concern. Well, they got the facts wrong as to one of the facts. But they didn't get the facts wrong as to the 1992 plan. And so, therefore, here we are again. Okay. I would like to go ahead and move on to the Lockwood, Eddings, Henry issue since I have a little bit of time left. I think the question before this court is why doesn't the use of the word wait mean that there was no Lockwood, Eddings error in this case? And my answer to that is pre-assigning a certain amount of wait to a certain class of mitigation, childhood abuse, violates the Eighth Amendment requirement of an individualized sentence. Yes, it's true. A senator is free to assign any amount of wait to mitigating circumstance. But what can't happen is that state law dictate that a certain type of mitigation can never be weighty enough to justify a life sentence without causation. If you look at the underlying principle in Lockwood, Eddings, and Henry, as it's the senator must be. If I look at the, let's not go to the underlying principle that you want to articulate from them. Let's look straight at the cases. Is there anything in the cases that says what you're saying? The cases don't even come to the principle you're coming about, do they? I've read these cases pretty straight, and this was absolutely, you could not consider this kind of evidence. Actually, if you look at the case that the Arizona Supreme Court cited to, State v. Ross, it says a difficult. Well, let's look at the Supreme Court precedent, since that's what I'm bound by. Right. And I believe the key part of that analysis sometimes gets overlooked. It's not just that you are able to consider the evidence, it's that you'd be able to give effect to it. And what does give effect to mean? It means a life sentence. What part of Eddings gets us to where you want us to go in this case? What are the phrases of Eddings that you say get us there? I mean, I read Eddings pretty carefully, and I read the holding in Eddings, and I can't get where you are going. Well, Penry and Penry 2 are actually how they give effect to language, and they say it stems from Lockett and Eddings. So Lockett and Eddings are not really what you're after? No, they're part of the analysis. It's a continuing line of case law, but Penry was clearly established at the time of Hedlund's appeal. I would like to reserve the remainder of my time for rebuttal. Good morning. May it please the Court. My name is John Anderson, representing Director Ryan in the State of Arizona. Good morning. I'll address the issues in the order that Ms. Harms did, if that's okay with the Court.   It's not just a case law. In the case of the plea agreement, there was no second plea agreement. Arizona law requires that a plea agreement be in writing. As I believe Casey Stengel said in oral context, not where the paper is written, there was no formal second agreement. What happens when there's a plea agreement is the prosecutor goes to his file, he gets the form, he fills it in, he offers it to the defense. There's no evidence of a second agreement here. There was some discussion, evidently. There might have been an informal agreement, but that's not a sufficient agreement under Arizona law. And what did he fill in, what did the prosecutor fill in, with respect to Mr. Hedlund's accountability, first as to the McLean death and second as to the Mertens and or McLean burglary? The first plea agreement, which is in the record, there's a copy of that, it was second degree for Mertens and theft for McLean. Second degree murder for Mertens. I'm sorry, theft for the McLean incident. That was the first agreement. There was no homicide, no agreement on any homicide. So the first agreement had second degree burglary for? Theft, I believe. Theft. Theft. Not even burglary. For Mertens? I'm sorry, let me make that clear. For Mertens, it was second degree murder. And for the McLean incident, it was merely theft. And the second purported agreement, Mertens is the same second degree murder, but on the McLean, for the McLean incident, supposedly the state bumped that up to burglary, which increased the sentencing range, I think, to about 35 years. But if you look at what Judge Sheldon said, it's a change of tone. It doesn't seem odd to you that the offer was second degree murder as to Mertens. Yes.  And there's no offer of murder one way in either of these plea agreements as to McLean, where the evidence indicates Hedlund was the shooter. Yes, and I think that's what concerned the court. And that's why the court later said it would have rejected that, because it wanted accountability for the McLean ‑‑ I mean, sorry, for the McLean homicide. And that wasn't in either agreement. In SCR ‑‑ I lost my page numbers. At 30, Judge Sheldon, he was concerned that he had two separate individuals charged with capital murder and a very strong circumstantial evidence case against both, and he was concerned with the appropriateness of any disposition that failed to accurately indicate the culpability of each of the defendants. So I think the court made it pretty clear that it wasn't going to accept anything other than some kind of homicide charge against Hedlund. And it was concerned with the ‑‑ Not some kind of homicide charge, but a homicide charge as to McLean's death. As to McLean's death, yes. Yes, that's what it said repeatedly. And that offer was never made by the defense. No, there was never any such offer. There couldn't have been any effective assistance of counsel because even under the new case of Lafler v. Cooper, to show prejudice, you have to show that the trial court would have accepted the plea. And there's no chance here that it would have been accepted. Is there any evidence in the record that Petitioner ever rejected the second plea offer? He only rejected it according to what counsel said. There's no evidence from the defendant himself. What counsel indicated was that, as we talked about this morning, was that he said he wasn't going to plead to Judge Sheldon because evidently the second agreement had sentencing ranges on both charges. So he didn't want to, and that's what his attorney said, but Hedlund didn't want to plead before Judge Sheldon, evidently, maybe thinking it was a harsh sentence and he wanted another judge. And there was some indication, part of the motion for change of judge, it wasn't baseless, it was based on defense counsel said that Judge Sheldon had been looking at some victim letters or was too concerned about the victim. Are the victim letters in the record? I believe they are in the sentence. Let me take you back a second. I've been sitting here listening to two different versions of what Judge Sheldon wanted in the second plea agreement. Ms. Harms tells me that all he wanted was an uptick from second-degree burglary to first-degree burglary because that would increase 14 years on the sentence. You're telling me that Judge Sheldon wanted a guilty plea as to a homicide of McClain. Now, keeping in mind those two quite different views, right, what I'd like you to do is to, number one, tell me what the record shows as to either of those views, and I'll take down your record citations. Certainly. I think the record's quite clear. Well, first you have the PCR ruling, which is the excerpt of the record on 106. Now, do you have the ‑‑ is there anything in ‑‑ so I agree with Judge Bea's question here because it's one or the other. So is there any place where it's in the record, written, transcript, anything where we have Judge Sheldon's exact words? Yes. In the motion for exchange of Judge Sheldon extensively explains his reasoning. Give me the citations to that. That's RSER. Say again? That's our supplemental excerpts of the record. Okay. And Judge Sheldon's testimony. You really have to look at the whole testimony. Just read his testimony. You're saying if we read his testimony, we'll know the answer to the motion. Right. It's quite clear. I mean, I can cite particular parts of the testimony. Give me the page numbers, if you would. A, S, E, R. Sure. That's RSERA. And let me find some. You're really saying R-S-E-R, not A. That's Respondent's Supplemental Excerpts of the Record. Right. Because we thought. Judge Bea said A. We thought. I'm just trying to make sure that we get the right. You got R-S-E-R-A. Yeah. What pages would you suggest? Several. At the bottom of page 26, I don't know if the Court wants me to explain what each citation says. Just give me the pages. Pages. I'm just going to read it. 26 to 27. 26, 27. Right. Page 28. Page 30. Page 31. Page 32. Page 37. Page 38. And page 43. Now you can characterize or encapsulate what you were about to say. Thank you, Your Honor. He was concerned, and this is at page 44, if I didn't cite that one before. Judge Sheldon was concerned if I were to accept a plea that was so disparate to the defendant's culpability, if in hindsight Mr. Henlon was just as culpable, which turned out to be the case because he was found guilty of first-degree murder, a disposition then that would have allowed him this type of plea agreement while his co-defendant was facing the possibility of a death penalty, that's McKinney, was a factor I was considering. Because judges do consider the proportionality that came up in the Stokely case that happened. The execution was just this week. One of the arguments that the defense raised in the original writ to the U.S. Supreme Court was that Brazil, the other fellow who was 19, that it was disproportionate that Stokely got the death penalty and Brazil got 20 years. So the Court here, not knowing the evidence exactly, was concerned that Henlon was just as responsible in these killings and to give him a deal would be wrong. And I think in the citations, if you read the citations that I've given you in the record, I think...   And I'm not going to go into the details of the case, but I think that the Court has to be concerned as to McLean incident for Hedlund that does not involve a plea to a homicide count. Yes. He did say that a couple of times. And that's what I'd like to hear. And just to conclude, in the ruling on the Rule 32 petition, the Court stated, as the Court noted to counsel below, any plea which had lacked accountability for the McLean homicide would have been rejected by the Court. And he specifically uses the word homicide over and over. And at one point, I don't know if I can find this one, but he wondered why the State hadn't made an offer to Hedlund for first-degree murder with no death penalty. I don't know if I can find that one. But certainly he was concerned about whether, you know, if Hedlund actually killed McLean, which the jury found... You said on Rule 32... Oh, I'm sorry. What's the citation to the record? Page 107 is the Court's ruling on the Rule 32. In effect, the assistance claim wasn't raised until the Rule 32, of course. On appeal, the argument was that the Court hadn't made itself available. And the Court, the Arizona Supreme Court, this is ER 129, said that this record did not indicate that a second plea agreement was ever reached and submitted. And certainly it wasn't submitted because, as I said before, Rule 17 requires that it be in writing and then submitted to the Court. And there was just some discussions going on. There wasn't any plea submitted to the Court. But your position was that even if a plea agreement in writing had been submitted, which did not require Hedlund to plead guilty to a homicide count as to McLean, Judge Sheldon had made it clear in the motion to change judge on the citations that you've given us that he would not have accepted that because of his concern that it would leave McKinney liable for a death penalty and Hedlund, if he proved to be similarly responsible, would get a disproportionate penalty. That's correct. That summarizes our position, Your Honor. And also the judge expressed a little concern about even any second-degree murder plea because one of the charges was felony murder. It was premeditated and felony, but there's no lesser to first-degree felony murder. So the Court was a little concerned that any plea to second-degree murder would have a hard time with a factual basis when that's not a lesser. Educate me. In Arizona law, is a felony murder automatically a first-degree murder? Yes. It has to be. There's a U.S. Supreme Court case, Shad v. Arizona, that discusses that. I don't have a citation for that. But, yes, it does say that there's no lesser included offense to felony murder, whereas other premeditated murder, you can have a second-degree murder, manslaughter, and so forth. But there is no lesser, and Judge Selden was concerned that this would be a first-degree murder, that this was a felony murder that was committed during a burglary. So it kind of suggests itself as a felony murder, and he said that there's no lesser. So he wasn't sure that Helen could plead the second-degree murder on either victim. If the Court doesn't have any questions on that, have I answered the Court's questions on that issue? Maybe it would be helpful to go back and look at the citations that you gave us. Yes. It is certainly helpful to look at the record, Your Honor. Regarding the leg brace, I think the – you have to look at the – and it was a leg brace. It wasn't shackled. The judge intended them to be non-visible. Evidently, things didn't work out, and there was some testimony that the jurors saw them. Now, Judge Selden did make the finding. One of his findings was that if they were visible, it was because the – it was defendant's doing. In E.R. 212, the Court found the evidence introduced at the hearing – and actually, this was various hearings. There were – well, there were the two discussions with Jack Lane from the Sheriff's Department before trial. Judge Selden found that Hedlund was lifting his pants leg to demonstrate the leg brace. Had he put his pant leg down, it wouldn't have been visible. But that – this seems not quite accurate because no matter how far you put down the pants leg, it has to stop at the foot. I think he was – I think he was saying that if Hedlund had worn non-skinny jeans, non-tight pants, that it could have gone over the leg brace. But no further than the ankle. And I think that's as far as the leg brace can go. No, it went all the way around. Now, there are pictures in the record. Yeah. So that was the judge's finding. And also I think that if you – Well, won't you just conceive that they were visible? Let's go on. Fine. Yeah, no, I'm happy to move on. I'm just trying to explain the record. Well, since it is, counsel moved, didn't they, to put drapes or something around the table? Yes, there was some discussion of that. Why didn't the trial court do that? I don't know. I haven't asked Judge Hedlund, and there's nothing on the record. He did take several steps to try to make them not visible. He did replace the tables with a table. And, fortunately, you have pictures of it, which is nice because there's a record. But the table came down quite a ways. He ordered that the defendants be seated while the parties go in and out of the courtroom. But he could have ensured that they weren't visible at all. He didn't do that. He could have. The defendants also could have worn pants that concealed and kept their legs back. But I'm not here to harp on the visibility issue because I think the sounder issue is wrong. Okay, we can see it's visible. Yes, I'm not here to argue that. The judge didn't do everything he could to make them not visible. His intent was to have them not visible, but that didn't work out. If that was his intent, he certainly could have done it. Well, yeah, the fault is in the execution. You know, I'm also wondering about the essential state interest. One of the reasons he gave for the essential state interest is that the fact that the dual juries and the courtroom layout made this situation more potentially dangerous. Isn't that right? Well, I think there were a lot of findings. That was part of it, was that it was kind of a crowded courtroom. Jacqueline also testified that, see, this wasn't the main Phoenix courthouse. I'm not sure if there are counselors. Was this the Mesa? This is the Mesa Southeast Judicial District. I've been there. Okay, great. Soccer. You know exactly where it is, yeah. Okay. So Jacqueline testified that one of the concerns was that that was a less secure courthouse because I guess there's more exits and so forth. But did he? He didn't. I mean, the thing is, you know, these claims may have more or less merit, but if he had not had dual juries, if he had not tried them together, if he had not had to have this cramped courtroom layout, he might have still shackled McKinney, but the essential state interest for Hedlund would not have. No, I don't think. Just hear the argument out, and then you can answer it. Okay.  This might not have been so essential with Hedlund, who hadn't really made any escape attempt, unlike McKinley. Yeah, I think it's been brought out that Lane said that the escape, the 92 escape attempt or plot was with McKinney and Hedlund, and nothing in the record rebutts that. And I think the record shows that Sheldon is primarily concerned with the 92 incident, giving its proximity to the trial. And there were other factors, such as the crowded courtroom and so forth, and there were multiple factors, and that's why I think the courts should look, essentially look at the trial court, whether the trial court's decision was unreasonable. There's a case from this course called Crinton v. Ayers, which I cite in my brief at 624 F 3943, and they essentially look at the California Supreme Court did consider it on appeal, but they look back to what the state trial court did. And the holding is, we hold that the trial court's decision to prevent physical restraint of Crinton in a trial was not based on an unreasonable determination of fact, and Crinton has failed to rebut this presumption by clear and convincing evidence. So I think there was, I mean, part of the factor is that these were two charged murderers. And if you look at the law, the Petitioner cites some of the Ninth Circuit cases, but I think you have to look at the U.S. Supreme Court cases, and even that, which wasn't issued until later, but still just reaffirms the standards that are set forth in Holbrook and Clinton in Illinois v. Allen, says that the Constitution forbids visible shackles unless that use is justified by an essential state interest, such as an interest in courtroom security specific to the defendant on trial. And I think that's exactly what you have here. So I don't think DEC was the case, or it was sentencing, and I think some people were a little surprised that this restraint was extended to sentencing, but really it's just a reaffirmance of the standards that apply at trial to sentencing. And Illinois v. Allen was a shackling, you know, bound and gag kind of case, and the other one, Flynn, was four courtroom deputies were up, so. But do you think there's no distinction between Hedlund and McKinney with respect to the shackling? No, there's not, because the escape plot was with both of them. So, and that was the main thing that the trial court was concerned about, I believe, if you look at its minute entry denying the motion for a new trial. It said, this is ER-212, After considering all the options, the court concluded that in order to limit the number of deputies in the courtroom during trial, which would have been prejudicial also, given the possible risk of escape of two extremely dangerous defendants, and in order to ensure the safety of the jurors, court personnel, and other individuals in the courthouse, that the defendants should wear a leg brace during trial. So that's what the trial court found, and I think that's clearly a justified State interest, which is all that's required under the U.S. Supreme Court. Essential State interest. Essential State interest, yes. Help me out, if you would. You cited the Allen case, no visible shackles unless justified by State interests and the circumstances. Right. We know that the shackles here, the leg brace, let's not call them shackles because they're not really shackles, leg brace, the leg braces were visible, and we know that they could have been made invisible to the jurors by, as Judge Smith suggested, by putting drapes over the table. Now, to what extent must a court go not to violate the due process rules of Allen v. Illinois? Right. I think, well, the Supreme Court case is a... Is it like narrow tailoring under the First Amendment? Is there, if there is a more restrictive way to do so that... Right. ...the shackles or the restraint aren't visible and they fail to do it, is that a violation of due process? No. No, it's not, Your Honor. And this Court in Crittenden said that there's no least restrictive restraint analysis. Again, my paper is mixed up here, but that's the case. What case is that, least restrictive? Crittenden, C-R-I-T-T-E-N-D-O-N. And here we go. Let's see if I can find a page citation for you. That's fine. I'll find it. Yes, it's kind of in the middle. It says it rejects the less restrictive alternative analysis. And I think it's pretty clear that the leg brace is about as the least restrictive means of control that you could have, because it is meant to be non-visible. Now, it didn't work out in this case, and I can see that. But it's not – it doesn't convey the sense of dangerousness that body chains do, because the defendant, you know, can move around if he was really that dangerous. You say there's no least restrictive analysis required. Is there a least visible analysis required? Well, I guess I would answer that as saying we're not even worried about the visibility. We're saying that as long as it's justified, it doesn't matter whether they're visible or not. And there's another case from this Court called Larson, which I cite in the brief. I don't know if I have it up here with me. But it says part of the prejudice analysis is based on the type of restraint, the evidence, and so forth. And where the restraint is the leg brace, which is not very restrictive at all. The defendant can still use his hands. He can still talk to his attorney. All he can do is he can't run away, or he can't run at people. He has a stiff leg brace. Let me ask you this, because we're dealing with AEDPA. Is there a clearly established federal right determined by the Supreme Court of the United States that if restraints are to be used, the prosecution or the court must ensure that they are as least visible as possible? Well, least restrictive. I don't know. Your position is if they're justified, we don't care about whether they're visible. Right. That's true. That's true. I mean, that's the bottom line. So my question was, is there a visibility case as opposed to a restriction case? I don't know if there's a case that says that it has to be least visible. It doesn't have to be the – Crittenden says it doesn't have to be the least restrictive, which I think is kind of tied to visibility as well. I mean, they can use stone belts. I'll take a look at Crittenden. You know, a court can – and this is a trend now to use either a stone belt or a leg brace because they aren't visible. And that kind of gets you around – because the Supreme Court has never said that non-visible before restraints or any kind of due process violation. If they are non-visible, you don't even start the analysis. Mr. Brown, do you want to address the Eddings issue? Sure, Your Honor. I'd be happy to. I don't have four minutes left. Before you go to Eddings, there is one thing Judge Wardlaw asked you about, which I was surprised by your answer. There's no question that McKinney had an actual 1991 escaped attempt, right? That's correct, Your Honor. So that is a little bit different than Hedlund, correct? Yes. I mean, you emphasized the 1992 plan, which I appreciate you emphasizing, but there was an actual escape attempt by McKinney in 1991. Right. So, I mean, McKinney – So it was – it is a little different. Yes, it is different, but I don't think that doesn't justify the restraints on Hedlund. It would show that McKinney is the more dangerous of the two as far as the escape threat. Well, the testimony – the testimony even of the cooperating witnesses, they testified that Hedlund was the nonviolent one and McKinney was the violent one and McKinney was the ringleader. And they seemed to – Right. – relate more. They liked Hedlund more.  I mean, that seems to be the general consensus, that Hedlund is slightly nicer, but he also shot – No, I realize that. But I'm just saying in terms of they didn't – their testimony all supported that he was less violent. Right. And that just links back to me. Like, I know it's not a separate but really viable claim at this point that – but I may look into it further. But the whole decision when – you know, the back and forth about doing – not severing the defendants and having the dual juries and trying them together. I mean, if Hedlund – we can't know for sure, but if Hedlund had had his own trial, he may not have been shackled because the same degree of danger was there. Well, I don't think that's true because – Well, I mean, I think they're more dangerous together. There's more security risk when the defendants are together. I think that's true. But – and so we don't know if there had been separate trials, but – The way I see this is that Judge Hedlund – I'm sorry, what's his name again? Stephen Sheldon. Is he still alive, Sheldon? He's alive. He's retired from the bench. Retired from the bench. Judge Sheldon, he created a lot of these problems that led to the shackling by some of his procedural decisions. And that kind of – and I don't know if I have time to address it, but that goes to the dual jury and the – which has been upheld by this court and so forth. No, I realize all that. That's what I'm saying. They're not independent, viable claims. But he sort of created the situation by virtue of his decisions that led to the shackling of both of them. Well, I still think that the escape plot was the prime reason for the shackles. I'll try to get to the Eddings issue real quick. I'll have a minute and 15 seconds. But the Arizona Supreme Court opinion, which is ER 139, rejected the claim. It's a headlines claim that the trial court discounted expert psychological testimony. And there's nothing in there that indicates this court is, I'm sure, well-aware of the Eddings jurisprudence. There's been several cases before the court. And in Shadd, the court said that we presume that the state courts know what they're doing, that they apply Eddings. And unless there's something specifically in the opinion that indicates that they didn't, then there's no Eddings violation. The court says it considered it, but it did. Shadd, recently, and Towery, even in the Stokely opinion, there's an opinion that came out November 21st where- I think we're familiar with that opinion. Okay. Well, you've had plenty of Eddings. I don't know that I need to argue it other than to look at the record. Let me ask you a question on Eddings, though. Because we seem to have somewhat of an intra-circuit split on this. And I don't know if you briefed it or adequately briefed it in the Stokely case. But if there was Eddings error, is that structural error, or must you also show prejudice? No. Actually, I reviewed the Stokely pleading, and we extensively briefed it. Oh, you did. It said that it's non-prejudicial. There were three parts to our Stokely response. One, that there was no abandonment. Two, there's no Eddings violation. And three, that an Eddings violation is not structural. Okay. And it's basically evidence that's not considered. It's analogous to additional evidence being come forth later, and the judge said that additional evidence wouldn't have made any difference. On this, the reviewing court can say, well, the additional evidence that the trial court didn't consider wouldn't have made any difference. So I think it's clearly subject to our analysis. Does the Court have any more questions? Thank you very much. Thank you. Ms. Harms, I believe you reserved some time. Thank you. To answer your question, Judge Wardlaw, about the prosecutor's deadline, I started a quote from part of it, but I didn't get all the way through. It's Respondent Supplemental Excerpt A57, where the prosecutor says, we were talking Tuesday afternoon. He advised me to have them turn the plea down. I said, fine, if we don't plead something by Friday, that is it. I was not at any plea proceeding on Friday. And then also, in regard to this question of whether or not burglary, in the first degree, was what the judge was indicating, I don't think you can assume because he calls the count, the count was a homicide count. They charged him with homicide. So I think when he's referring to homicide, you can't assume that he's saying you have to plead guilty to murder, because what he says at Respondent Supplemental Excerpt of the Record A32, the question from defense counsel at recusal hearing to the judge, isn't it correct that you had suggested to counsel that something related, relating to burglaries in the first degree would be an appropriate range or the type of thing you might consider in a plea agreement? I believe I indicated to you that I believed at the very least what you should be looking at would be burglary in the first degree, which would be entry in the home armed with a weapon, either as a dangerous offense or non-dangerous, depending on what counsel believed might be appropriate. I believe that was at least some guidance to you. So it was clear this judge was willing to accept a second modification. I'm sorry. A32. A32. Thank you. So regardless of whether or not the modification, particular modification, would have been accepted, we do know that the judge was willing to entertain something less than a death sentence, because he gave the parties two weeks in order to negotiate a second plea. And he gave them a deadline, which counsel completely blew the deadline, and there's no excuse for that in a death case. Hedlund's culpability was less than McKinney's for these crimes. And we don't have to guess at that, because the judge in sentencing Hedlund said things which are very telling. I think he based his culpability on him being an accomplice. If you look at ER 186, he said the defendant stood by while the victim was senselessly killed. ER 192, there was a prior plan regarding the burglary. It hadn't changed. McKinney's intent to be armed and to inflict death, if met with any arguments, apparently continued in full force and effect with the assistance of this defendant. And at another point in the record, he says, I find that you associated yourself with a known killer, your brother. So it's clear that the judge felt that his culpability was based upon his actions as an accomplice. In regard to the restraint issue, I think the judge's intent to be armed and to inflict And the judge's intent to be armed and to inflict death, I think is based on the fact that Hedlund, who shot McClain, Hedlund sawed off a .22 rifle, leaving palm prints and fingerprints on the briefcase of McClain and on the magazine of the .22 rifle, which was later attempted to be hidden in the desert by Hedlund. Well, I think if you look at everything, all those actions can also be explained by the fact that he was definitely helping his brother hide evidence after the fact. And the evidence showed that his brother took his car. His brother took his gun. So there's no reason to assume from that. Everything that they point to is a fact for Hedlund being the actual killer. And so I think that the fact that he was the actual killer can all be explained as hiding evidence after the fact. So you're saying the fingerprints on the sawed-off shotgun, the fingerprints on, I don't know, what the briefcase was hidden to? Well, the briefcase does tend to show that he was present at the scene, although there was an alternative explanation for that. The fingerprint examiner said she didn't know how old those prints were. You couldn't tell, and Hedlund did buy a car from Mr. McClain. Okay, but you're saying the gun, were there also McKinney's fingerprints on the gun? No, and the testimony was that McKinney always insisted on wearing gloves, and there were gloves found in his residence at the search. I'm not trying to disagree with you, but your real argument is you're trying to look at what the judge said rather than what the jury found, right? I mean, the jury's finding, the jury found. What did the jury convict your client of? Premeditated first-degree murder, yes. And they ask a question in deliberations which I think is very telling. They said, could the defendant be convicted as accomplice in the burglary and not be convicted of the murder? And the jury instruction on accomplice liability, if you read it, he could be found guilty of premeditated murder based upon his evidence. He could be found guilty of premeditated murder based upon his brother's actions. I would like to turn now to the restraint issue. And I think if you look at Hedlund and all the restraint cases, he does not have the kind of record which justifies restraint. In Duckett v. Godness, this Court made a pretty good list of what kinds of things are normally needed in order to restrain someone. Evidence of disruptive courtroom behavior, we don't have any of that. Attempts to escape from custody, we don't have any actual attempts to escape from custody. We have someone overhearing McKinney talking. Assaults or attempted assault while in custody, we don't have any of that. A pattern of defiant behavior towards corrections officials and judicial authorities, again, that's not present here. So there was not a compelling state interest. Let me ask you something, though. If there was a compelling and essential state interest for McKinney and Hedlund is tried with McKinney, does that justify the leg brace for Hedlund as well? No. I can't put my finger on the name of the case right now, but the right is defendant-specific. You cannot impute McKinney's escape risk to Hedlund. And that would be a reason to separate them if that was the reason. It's also not impossible to have foot-leg braces on McKinney and not foot-leg braces on Hedlund in the same trial. Yes. And when actually Hedlund's attorney argued that, McKinney's attorney, of course, said, well, that's unfair because they're going to look at my guy and assume that he's more culpable because he has restraints on and Hedlund doesn't. Then they could have put a tablecloth up and the jury never would have known. Exactly. It would have been very easy to make them nonvisible. I would like to turn to the Lockett-Eddings-Penry issue again and your question about structural versus harmless error. And applying harmless error analysis has no basis in Supreme Court law. If you look at Penry 2. Does that matter to us in view of Stokely v. Ryan? I think it should because and I think It should. But remember that we are a three-judge panel. Stokely v. Ryan says it's not structural. Harmless error applies. Doesn't that bind us as a three-judge panel? Well, I think you could take that view, I believe. And I can explain to you why if you do have to do substantial and injurious analysis, I think in this case you could say it was. And here's why. If you look at the facts of Stokely, it was a particularly brutal crime. Here there was only one aggravating factor. The sentencing court basically assumed his culpability was based upon the fact that he was associating himself with a known killer, his brother. You have the fact that he was offered a plea bargain that indicates that the prosecution did not think they had a slam-dunk death sentence. The jury's verdict of second-degree murder for the mertens crime indicates that he was not as culpable as his brother. The evidence was not overwhelming. And if you look at Stokely regarding the childhood evidence, the court said it was at best inconsistent and contrajectory. The judge in this case said, I feel compassion and anguish sitting here and listening to what you had to go through as a child. He said, I find it credible. So it was not that this evidence wasn't believable. If there is any case where childhood evidence was not believable. And it wasn't that he didn't weigh it either. Well, the state law said you can never give effect to it unless he shows causation. If you're saying it can never be weighty enough to support a life sentence. I mean, all I was saying, based on what you've said to me, which I truly believe he said and I truly believe he looked at, I have a tough time with you then, on the other hand, arguing your other argument. But you can go ahead. Well, let's look at what the language in the sentencing special verdict says. And this is ER 200 through 201. I've concluded that the evidence regarding the childhood can be considered truthful. There are significant aspects of your childhood that were clearly abusive. I have listened to these witnesses. They have made an impact on me. In regard to all this mitigation, including the childhood abuse, none of these mitigating factors separately or commutatively indicates that they affected your ability to control your behavior at the time of the crime, appreciate the wrongfulness of your conduct, that you were not aware that what you were doing was wrong. So that's the causal nexus. And that is what the court has said over and over again, you can't do. You can't treat Defendant A, who says I had a bad childhood because my parents were divorced when I was young, the same as Defendant B, like Hedlund, who clearly had a severe childhood, by saying they both have to prove causation in a blanket manner, treat that childhood abuse as never going to be able to support a life sentence. That violates the Eighth Amendment, because the only valid test for mitigation is a test that exists in that individual sentencer's mind. You can't have a state court law saying you can never give a life sentence for this unless they show causation, and that's what Arizona did. All right. All right. Thank you very much, counsel.
judges: Wardlaw, Bea, Smith